UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

------------------------------------------------------------------------x

SHIRLEY STEARNS, *et al.*,                                          :
                                                                    :
     Plaintiffs,                           : **Case No.: 17-cv-131 (RCL)**
                                                                    : **Filed Under Seal**
-against-                                                           :
                                                                    :
ISLAMIC REPUBLIC OF IRAN,                                           :
                                                                    :
     Defendant.                            :

------------------------------------------------------------------------x

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING
<u>16 PLAINTIFFS IDENTIFIED IN THE COURT'S OCTOBER 3, 2022, ORDER</u>**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

I.      PROCEDURAL BACKGROUND ...............................................................................1

II.     CATEGORIES OF CLAIMS ......................................................................................1

III.    THE 16 PLAINTIFFS' INJURIES .............................................................................3

        a.      The January 18, 2009, Attack – Baghdad .........................................................4

                1.      Claim by Estate of Roberto Andrade ........................................................5

                        i.      Economic Loss Claim ....................................................................5

                2.      Solatium Claims Brought by SSG Andrade's Family Members.................6

                        i.      Sandra Valencia ...........................................................................7

                        ii.     Veronica Pena Andrade ..............................................................10

                        iii.    Angelica Andrade ........................................................................13

                        iv.     Veronica D. Andrade ..................................................................16

        b.      December 1, 2007, Attack – Baghdad ............................................................19

                1.      Solatium Claims Brought by SPC Reece's Family Members...................20

                        i.      Preston Reece..............................................................................20

                        ii.     Shaylyn Reece .............................................................................22

        c.      March 20, 2007, Attack – Baghdad ................................................................24

                1.      Claim by Estate of Curtis E. Glawson, Jr......................................................25

                        i.      Economic Loss Claim ..................................................................25

                1.      Solatium Claims Brought by SPC Glawson's Family Members ...............27

                        i.      Jazmon Reyna .............................................................................27

        d.      May 5, 2006, Attack – Baghdad......................................................................31

                1.      Solatium Claims Brought by 1SG Saenz's Family Members ...................32

      i.     Luz Maria Estrada ..................................................................... 32

      ii.    Elva Espinoza .......................................................................... 35

      iii.   Frances Castro .......................................................................... 38

e.    April 22, 2011, Attack – Numaniyah ................................................ 40

   1.   Claims Brought by PFC Stiggins's Estate ........................................ 41

      i.     Economic loss claim ................................................................ 41

      ii.    Conscious pain and suffering claim ........................................ 43

   2.   Solatium Claims Brought by PFC Stiggins's Family Members ............... 44

      i.     Angel Mayes ........................................................................... 44

      ii.    Luke Stiggins .......................................................................... 47

      iii.   Donald Mayes ......................................................................... 50

CONCLUSION ............................................................................................ 52

# TABLE OF AUTHORITIES

**Cases**

*Elahi v. Islamic Republic of Iran*,
    124 F. Supp. 2d 97 (D.D.C. 2000) ........................................................................................2, 44

*Estate of Brown v. Islamic Republic of Iran*,
    872 F. Supp. 2d 37 (D.D.C. 2012) ...............................................................................................3

*Fritz v. Islamic Republic of Iran*,
    324 F. Supp. 3d 54 (D.D.C. 2018) ..........................................................................................7, 12

*Fritz v. Islamic Republic of Iran*,
    No. 15-cv-456 (RDM), 2018 WL 5046229, (D.D.C. Aug. 13, 2018) ...........................12, 51, 52

*Heiser v. Islamic Republic of Iran*,
    466 F. Supp. 2d 229 (D.D.C. 2006) .............................................................................................3

*In re Terrorist Attacks on Sept. 11, 2001*,
    No. 03-mdl-1570 (GBD) (SN), 2016 WL 8711419 (S.D.N.Y. Oct. 14, 2016) ........................13

*In re: Terrorist Attacks on Sept. 11, 2001*,
    No. 03-mdl-1570 (GBD) (SN), 2016 WL 6465922 (S.D.N.Y. Oct. 31, 2016) ........................13

*Murphy v. Islamic Republic of Iran*,
    740 F. Supp. 2d 51 (D.D.C. 2010) ...............................................................................................3

*Oveissi v. Islamic Republic of Iran*,
    768 F. Supp. 2d 16 (D.D.C. 2011) ...............................................................................................3

*Peterson v. Islamic Republic of Iran*,
    515 F. Supp. 2d 25 (D.D.C. 2007) ...............................................................................................3

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
    262 F. Supp. 2d 217 (S.D.N.Y. 2003), *amended*, 2003 WL 23324214 (S.D.N.Y. May 19,
    2003) ........................................................................................................................................2, 44

*Stearns v. Islamic Republic of Iran*,
    Case No. 1:17-cv-131-RCL, 2022 WL 4764905 (D.D.C. Oct. 3, 2022) ............................*passim*

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010) .........................................................................................3, 30

**Statutes**

28 U.S.C. § 1605A(a)(2)(A)(ii)(I) ...........................................................................................*passim*

28 U.S.C. § 1605A(c) ............................................................................................................*passim*

**INTRODUCTION**

This Report and Recommendations addresses damage claims arising from the injuries sustained by 16 of the 229 Plaintiffs for whom the Court granted default judgment against Defendant, Islamic Republic of Iran, in its October 3, 2022, Order, 2022 WL 4764905 (D.D.C. Oct. 3, 2022).

## I.    PROCEDURAL BACKGROUND

Plaintiffs filed their first Proposed Findings of Fact and Conclusions of Law in Support of their Motion for Default Judgment on December 30, 2021, in which they requested default judgment for Plaintiffs injured in 61 attacks. ECF No. 35. The Court granted default judgment in favor of those Plaintiffs on October 3, 2022. ECF No. 47.

On January 13, 2023, Plaintiffs moved to appoint me as Special Master to make a report and recommendation (R&R) for the compensatory damages claims of the 229 Plaintiffs implicated in the Court's Order granting default judgment, ECF No. 50, which the Court granted on February 21, 2023, ECF No. 52.

The Court authorized the special masters appointed in this case to file R&Rs on a rolling basis. *See* ECF no. 58. I filed my first R&R for the compensatory damages claims of 17 Plaintiffs on June 8, 2023, ECF No. 60, which are pending.

## II.    CATEGORIES OF CLAIMS

Plaintiffs are bringing three categories of claims which are typically adjudicated within the framework for damages in Foreign Sovereign Immunities Act ("FSIA") cases developed and utilized frequently in this District:

**(i)    Economic loss claims**: The representatives of a number of estates seek compensation for economic losses in the form of lost wages, benefits, and retirement pay. *See* 28

U.S.C. § 1605A(c) ("damages may include economic damages"). To support these claims for economic losses, Plaintiffs submit reports prepared by L. Wayne Plumly, Jr., Ph.D.

Dr. Plumly served as Professor of Economics at Langdale College of Business at Valdosta State University in Valdosta, Georgia, until 2005, and as Dean until 2020. He has previously provided expert reports regarding economic losses in terrorism cases which were adopted by courts, including in *Relvas v. Islamic Republic of Iran*, No. 14-cv-01752 (RCL) (D.D.C. Feb. 28, 2018), ECF No. 83 (accepting economic claims calculated by Dr. Plumly and adopting reports and recommendations found at ECF Nos. 50-52, 55-56, 62-63, 65, 71-72, 77) and *John Doe A-1 to A-49 v. Democratic People's Republic of Korea*, No. 18-cv-00252 (DLF) (D.D.C. Feb. 24, 2021), ECF No. 108.

(ii)    **Conscious pain and suffering claims**: The representatives of a number of estates also seek conscious pain and suffering claims. Courts have awarded victims who experienced conscious pain and suffering for seconds before their deaths $1 million. In *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 234 (S.D.N.Y. 2003), *amended*, 2003 WL 23324214 (S.D.N.Y. May 19, 2003), a plaintiff who worked in the South Tower of the World Trade Center was told to leave his office after a plane struck the North Tower. His office was on the 97th floor, and the second plane that struck his building did so between the 73rd and 82nd floors, creating the *possibility* that he experienced pain and suffering while descending the staircase when the second plane hit his building. The court awarded the victim $1 million. The court in *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 113 (D.D.C. 2000), also awarded a plaintiff who struggled with his assassin for thirty seconds before being shot and killed $1 million.

(iii)    **Solatium claims**: Courts have established baseline solatium awards for family members of victims who died as a result of terrorist attacks: The spouses of deceased victims

typically receive $8 million; their parents receive $5 million; their siblings receive $2.5 million; and their children receive $5 million. *See Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F. Supp. 2d 25, 52 (D.D.C. 2007); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010); *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006). Courts in this District have also established baseline solatium awards for family members of victims who survived terrorist attacks: Spouses receive $4 million, parents and children receive $2.5 million, and siblings receive $1.25 million. *See Peterson II*, 515 F. Supp. 2d at 52.

These baseline awards are "not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010), and may be adjusted based on "an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011). *See also Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43-44 (D.D.C. 2012) (awarding 20% upward departure to victim's sister who "suffered a 'nervous breakdown' following Anthony's death for which she sought medical treatment and was prescribed medication for approximately one year") (citing special master report and recommendation).

## III.   THE 16 PLAINTIFFS' INJURIES

This R&R describes the five attacks for which this Court found Iran liable, the injuries Plaintiffs sustained, and their ensuing claims for damages. Plaintiffs have requested the typical baseline awards granted for solatium claims for 14 of the 16 Plaintiffs. They have also requested

an upward departure for Jazmon Reyna, the half-sister of Specialist Curtis Glawson, Jr., and a reduced award for Donald Mayes, Private First Class Antonio Stiggins's stepfather.

  **a.**  **The January 18, 2009, Attack – Baghdad**

  On January 18, 2009, Staff Sergeant ("SSG") Roberto Andrade, Jr. was the truck commander of the lead vehicle of a four-vehicle convoy traveling from Forward Operating Base ("FOB") Rustamiyah to Baghdad when a multi-array explosive struck his vehicle, killing him. SSG Andrade's casualty report confirms that he was killed in the attack. *See* 2022 WL 4764905, at \*27.

  The Court found satisfactory evidence in the record to demonstrate that the explosive responsible for SSG Andrade's death in the January 18, 2009, attack was an Explosively Formed Penetrator ("EFP") "traceable to Iran and its proxies," and found Iran responsible for the attack "by supporting proxy forces who conducted the attack." *Id.* at \*28.

  The Plaintiffs in this case injured as a result of this attack are SSG Andrade's estate; SSG Andrade's mother, Sandra Valencia; SSG Andrade's stepmother, Veronica Pena Andrade; and SSG Andrade's two half-sisters, Angelica Andrade and Veronica D. Andrade. *See* Amended Complaint ("AC"), ECF No. 14, ¶¶ 1218-28. The following chart reflects the claims asserted by each of the Plaintiffs injured in the January 18, 2009, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Declaration of Dina Gielchinsky ("Gielchinsky Declaration").[1]

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|-----------|-------------------------------|-------------------|----------|---------|
| Estate of Roberto Andrade, Jr. | Deceased victim | Economic loss claim $1,786,097.12 | Order Appointing Representative of Decedent's Estate, dated April 3, 2019 | A |

---

[1]  Because of how voluminous the exhibits to the Gielchinsky Declaration are, Plaintiffs provided me with a link to them, and have indicated that they will provide the Court with the same materials.

| | | | Declaration of Roberto Andrade, Sr., dated April 12, 2021 | B |
|---|---|---|---|---|
| | | | Appraisal of Present Value of Economic Life of Roberto Andrade, Jr., dated March 30, 2023, prepared by L. Wayne Plumly, Jr., Ph.D. | C |
| Sandra Valencia | SSG Andrade's mother | Solatium claim $5 million | Copy of Sandra Valencia's birth certificate | D |
| | | | Declaration of Sandra Valencia, dated August 17, 2020 | E |
| Veronica Pena Andrade | SSG Andrade's stepmother | Solatium claim $5 million | Copy of Veronica Pena Andrade's certificate of naturalization | F |
| | | | Declaration of Veronica Pena Andrade, dated November 10, 2020 | G |
| Angelica Andrade | SSG Andrade's half-sister | Solatium claim $2.5 million | Copy of Angelica Andrade's birth certificate | H |
| | | | Declaration of Angelica Andrade, dated May 7, 2020 | I |
| Veronica D. Andrade | SSG Andrade's half-sister | Solatium claim $2.5 million | Copy of Veronica D. Andrade's birth certificate | J |
| | | | Declaration of Veronica D. Andrade, dated November 4, 2020 | K |

### 1.    Claim by Estate of Roberto Andrade

#### i.    Economic Loss Claim

As the representative of SSG Andrade's estate,[2] Roberto Andrade, Sr.[3] seeks compensation for economic losses in the form of lost wages, benefits, and retirement pay. *See* 28 U.S.C. § 1605A(c) ("damages may include economic damages").

---

[2]    *See* Ex. A, Order Appointing Representative of Decedent's Estate, dated April 3, 2019, appointing Roberto Andrade, Sr. as representative of SSG Andrade's estate.

[3]    Roberto Andrade, Sr. brought claims individually as a plaintiff in *Karcher, et al. v. Islamic Republic of Iran*, No. 16-cv-232 (CKK).

To project SSG Andrade's future income stream if not for the attack, Dr. Plumly incorporated testimonial evidence that he planned to serve eight years in the Army, after which he would have secured employment as a firefighter in Arizona, and overlaid that information against statistical data generated by the Bureau of Labor Statistics, the Department of Labor, military pay websites, and other relevant sources.[4] From these sources, Dr. Plumly calculated the present value of SSG Andrade's lost income, assuming that SSG Andrade, who was 26 years old when he was killed, (1) would have remained in the military for eight years; (2) would have used the GI Bill to obtain training as a firefighter and secured employment as a firefighter in Arizona with an annual income of $43,744.49, adjusted annually by 3.085%, the percent change for the relevant years according to the U.S. Bureau of Labor Statistics; (3) would have started collecting Social Security Retirement ("SSR") benefits at age 67; and (4) had a life expectancy of 76.66 years.[5] Dr. Plumly adjusted these income figures for taxes and consumption, adjusted the SSR benefits for inflation, and adjusted the total lost earnings and SSR benefits to present value at a rate of 3.35%, the average yield of 30-year Treasury Bonds between 2006-2022.[6] Adjusted to present value, Dr. Plumly calculated the estate of SSG Andrade's economic loss claim as $1,786,097.12.[7] I recommend that the Court approve Plaintiffs' requested award of $1,786,097.12 for the estate of SSG Andrade's economic loss claim.

### 2.    Solatium Claims Brought by SSG Andrade's Family Members

---

[4]    *See* Ex. C, Appraisal of Present Value of Economic Life of Roberto Andrade, Jr, dated March 30, 2023, at 3-4.

[5]    *See id.*

[6]    *See id.* at 4-5.

[7]    *See id.* at 5.

SSG Andrade's family members seeking solatium damages in this case include his stepmother and two half-sisters. In assessing whether to award step and half-relatives solatium damages, courts in this District assess whether those relatives have demonstrated that they acted as the "functional equivalent" of an immediate family member. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) ("Accordingly, '[s]iblings of half-blood ... are presumed to recover as a full-blood sibling would,' *Peterson II*, 515 F.Supp.2d at 52, and step-siblings have recovered as immediate family members when they were 'treated like a brother [or sister]' or the 'functional equivalent of a brother [or sister].' *Valore*, 700 F.Supp.2d at 80."). I find that the submission by Plaintiffs demonstrates that SSG Andrade's stepmother and half-sisters constitute the "functional equivalent" of immediate family members.

### i.  Sandra Valencia[8]

Sandra Valencia called her son "Junior,"[9] and described how "Junior was simply a good guy."[10] Sandra and SSG Andrade's father divorced when he was three years old, but they lived close to each other, and Junior sometimes rode back and forth between their houses on his bicycle.[11] He lived with Sandra and her mother at first, staying with his father and stepmother on many weekends and alternate holidays, and with his father and stepmother during two years of middle school.[12]

---

[8]     Sandra Valencia's declaration and birth certificate confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. D, birth certificate; Ex. E, Declaration of Sandra Valencia, dated August 17, 2020, ¶ 1.

[9]     *Id.*

[10]     *Id.*, ¶ 9.

[11]     *See id.*, ¶ 5; Ex. I, Declaration of Angelica Andrade, dated May 7, 2020, ¶ 6.

[12]     *See* Ex. E, Declaration of Sandra Valencia, dated August 17, 2020, ¶ 6; Ex. G, Declaration of Veronica Pena Andrade, dated November 10, 2020, ¶ 8.

Sandra has "happy memories of doing simple things" with her son, like watching TV and decorating their Christmas tree.[13] He was athletic, and she bragged about him all the time.[14] She was proud of how he played for the varsity team as a freshman, but she was also proud that he was polite and opened doors for women.[15]

Sandra recalled that "Junior had a strong desire to accomplish something with his life,"[16] and enlisted in the Army soon after the September 11, 2001, attacks.[17] Sandra spoke on the phone with him during his basic and advanced training, and "could tell he was still very happy with the path he'd chosen."[18] Junior was deployed to Iraq three times, and Sandra wrote him letters and sent care packages. She looked forward to the "many big hugs" he would give her when he was home between tours and wished he could stay home with her, but she knew how seriously he took his service responsibilities.[19] Sandra "was and am very proud of his drive and his efforts."[20]

Sandra recalled how she cried over the news that the two uniformed men who showed up at her house on January 18, 2009, delivered to her.[21] She cried so hard that she could not call anyone to let them know what happened; instead, she went to work, hoping that if she did not think

---

[13]    Ex. E, Declaration of Sandra Valencia, dated August 17, 2020, ¶ 7.

[14]    *See id.*, ¶ 8.

[15]    *See id.*, ¶¶ 8-9.

[16]    *Id.*, ¶ 9.

[17]    *See id.*, ¶ 10.

[18]    *Id.*, ¶ 10.

[19]    *Id.*, ¶ 11.

[20]    *Id.*

[21]    *See id.*, ¶ 13.

about what she had just been told, it might not be true.[22] Her plan failed, and she left work early, feeling overwhelmed by "incredible sadness."[23]

Her crying continued for days, and just when she felt like she had no more tears to cry, the military notified their family that they had found more of SSG Andrade's body parts:[24] "I started crying all the time all over again."[25]

Sandra stated that she still cannot believe that her son is gone.[26] She asks herself every year on her birthday – which is the day before Junior's – how long she "should" be so unhappy or depressed, and she still has no answer.[27] No matter how much time passes, she "still feel[s] that way."[28] Certain days are worse than others – her birthday, Junior's birthday, Memorial Day, Veterans Day, Thanksgiving, Christmas, and Easter are all particularly challenging.[29] Regular days can also be overwhelming if she sees someone who looks like Junior or a memory of him springs to her mind.[30] Sandra tries to focus on the happy times she had with her son, but cannot deny the "sadness that is always with me."[31]

---

[22]    *See id.*, ¶¶ 13, 14.

[23]    *Id.*, ¶ 14.

[24]    *See id.*, ¶¶ 15, 16.

[25]    *Id.*, ¶ 16.

[26]    *See id.*, ¶ 18.

[27]    *Id.*, ¶ 20.

[28]    *Id.*

[29]    *Id.*, ¶ 21.

[30]    *See id.*, ¶ 22.

[31]    *Id.*, ¶ 24.

I recommend that the Court approve Plaintiffs' requested award of $5 million for Sandra Valencia's solatium claim.

### ii. Veronica Pena Andrade[32]

SSG Andrade was four years old when Veronica Pena Andrade married his father.[33] Veronica had two daughters with Roberto Andrade, Sr., and regarded Junior as the son she never had: "I loved him very much."[34] She treasures one memory where SSG Andrade introduced her as his mother to his friends while she was visiting him in Fort Hood.[35]

Like SSG Andrade's mother, Veronica also described how SSG Andrade lived with her during his middle school years and otherwise with his mother, spending weekends and alternate holidays with her. The schedule was not concrete, and Veronica remembered dropping him off at high school many mornings after eating breakfast together as a family.[36] It was important to Veronica to eat family meals together, and Junior particularly liked her Mexican dishes.[37]

Veronica recalled visiting her family in Mexico with SSG Andrade, where they spent afternoons at the beach and had cookouts for dinner. When SSG Andrade was older, he would visit the downtown clubs and drive off-road vehicles. Other family vacations included national parks,

---

[32]    Veronica Pena Andrade's certificate of naturalization and declaration confirm that she was naturalized as a U.S. citizen before the attack on February 29, 2008. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. F, certificate of naturalization; Ex. G, Declaration of Veronica Pena Andrade, dated November 10, 2020 (citations to this declaration refer to the English translation starting at page 6 of the pdf), ¶ 1.

[33]    *See id.*, ¶ 5.

[34]    *Id.*

[35]    *See id.*, ¶ 14.

[36]    *See id.*, ¶¶ 7, 8.

[37]    *See id.*, ¶¶ 7, 9.

amusement parks, and visits to relatives in Texas.[38] SSG Andrade played soccer, and Veronica attended his practices and games, even traveling hours to away games. After, they celebrated his wins at the local pizza parlor where SSG Andrade liked to play arcade games.[39]

Veronica remembered feeling happy when SSG Andrade enlisted in the Army, but also sad that he was leaving.[40] When he deployed, they spoke on the phone and over Skype, which alleviated Veronica's concern over him. She recalled happily sending him care packages with cookies, cheese sticks, beef jerky and sunflower seeds.[41]

Veronica called January 18, 2009, a "terrible day."[42] She knew instantly that something "was very wrong" when the military officers arrived at her house, but they would not tell her the news because she was not SSG Andrade's biological mother.[43] When her husband came home and they gave them "the awful news," Veronica felt physical pain.[44]

Veronica described how difficult the wait for SSG Andrade's body to arrive stateside was: "I wanted him home so badly. He was my son."[45] When the plane finally arrived, she wanted to see SSG Andrade's body, but they were not allowed. That was hard for Veronica.[46] Veronica

---

[38]     *See id.*, ¶ 10.

[39]     *See id.*, ¶ 11.

[40]     *See id.*, ¶ 12.

[41]      *See id.*, ¶ 16.

[42]     *Id.*, ¶ 17.

[43]     *Id.*

[44]     *Id.*

[45]     *Id.*, ¶ 18.

[46]     *See id.*

continued to feel pained at the funeral service and cemetery. She wanted to see him one last time but could not.[47]

"I lost my only boy," Veronica stated.[48] She looks at the photographs of SSG Andrade throughout her house and wishes they had more time together.[49] She feels "great sadness" on many days because he is not with her, and described how her "heart is still broken."[50]

Courts in this District grant solatium awards to step-relatives even when the direct victim maintained a relationship with a biological relative whose role was taken on or supplemented by the stepparent. For example, the court in *Fritz* adopted the recommendation of the special master appointed in that case to award the stepmother $1.5 million at the request of the plaintiffs in that case – 25% of the amount the court awarded to that service member's biological mother. *See Fritz v. Islamic Republic of Iran*, No. 15-cv-456 (RDM), 2018 WL 5046229, at *22 (D.D.C. Aug. 13, 2018), report and recommendation adopted as modified, 324 F. Supp. 3d 54. The stepmother and the direct victim lived in the same household for portions of a three-year period, during which the direct victim turned 18. *See id.* The special master in that case stated that "it is not clear that the duration of the relationship should matter," but noted that there "is a suggestion in the case law that the age at which the relationship commenced could be a relevant factor." *Id.* The special master opined that "[i]t would not be unreasonable to award a higher amount" than the $1.5 million plaintiffs requested on her behalf, "but in light of Vanessa's testimony – which indicates that while

---

[47]       *See id.*, ¶ 19.

[48]       *Id.*, ¶ 21.

[49]       *See id.*

[50]       *Id.*, ¶¶ 20, 21.

she feels a loss, the focus of her concern is the effect that Bryan's death has had on her husband," the plaintiffs' request was reasonable and appropriate. *Id.*

Similarly, the court in *In re Terrorist Attacks on September 11, 2001*, awarded two stepchildren full solatium damages for the death of their stepfather, even though they still maintained relationships with their biological father. Lea and Seth Bitterman, the stepchildren of decedent Donald Havlish, lived together in the same home with Mr. Havlish from the time they were six and eight, respectively, until the September 11, 2001, attacks, when they were 18 and 20, respectively. They saw their biological father every other weekend, and Mr. Havlish told Seth that he did not want to replace his biological father. Still, the magistrate judge had "no difficulty in concluding" that the plaintiffs were the functional equivalents of children to Mr. Havlish, and recommended that they each be awarded the full solatium damages of $8.5 million for a child. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-mdl-1570 (GBD) (SN), 2016 WL 8711419, at *8-9 (S.D.N.Y. Oct. 14, 2016), report and recommendation adopted sub nom. *In re: Terrorist Attacks on Sept. 11, 2001*, No. 03-mdl-1570 (GBD) (SN), 2016 WL 6465922 (S.D.N.Y. Oct. 31, 2016).

I find that Plaintiffs have shown that Veronica Pena Andrade was the "functional equivalent" of SSG Andrade's mother, and recommend an award of $5 million for her solatium claim.

### iii. Angelica Andrade[51]

---

[51]    Angelica Andrade's birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. H, birth certificate; Ex. I, Declaration of Angelica Andrade, dated May 7, 2020, ¶ 1.

Angelica Andrade was SSG Andrade's younger sister; he was seven when she was born to his father and stepmother.[52] Angelica recalled how he sometimes lived with his mother, and sometimes lived with them, but described how, "[r]egardless of where he slept at night, we saw one another often and hung out together on many weekends."[53] Angelica described how her "family of five" enjoyed summer vacations together, remembering one particular trip to Sequoia National Park, where they marveled at the giant sequoias.[54] They also visited family in El Paso during the holidays.[55]

Angelica recalled how SSG Andrade loved playing soccer and described how she attended his games throughout the years. Even after he deployed to Iraq, SSG Andrade told Angelica how he continued to play soccer with his Army buddies and the Iraqi children.[56] Angelica remembered sending care packages to SSG Andrade during his multiple deployments to Iraq. His mother and grandmother added items to their care packages, and Angelica and her mother and sister would add items to theirs.[57]

Angelica kept in touch with SSG Andrade through e-mail and telephone conversations, and especially enjoyed the opportunities they had to Skype: "It was always great to see his face while talking to him."[58] SSG Andrade came home on leave in 2008, and stayed at his father's house,

---

[52]     *See id.*, ¶ 5.

[53]     *Id.*, ¶ 6.

[54]     *See id.*, ¶ 7.

[55]     *See id.*

[56]     *See id.*, ¶ 8.

[57]     *See id.*, ¶ 9.

[58]     *Id.*, ¶ 12.

where Angelica was still living at the time. That was the last time they spent time together in person.[59]

Angelica was at a football game with her friends when her mother called her, insisting that she come home. Angelica resisted until her mother finally said that "something bad" had happened to her brother, and then started sobbing. Angelica started crying too. She left the game without answering her friend who had asked her if she was all right.[60] She cried "hysterically" on her way home, and when she got home, she went to her room and continued crying.[61] While they waited for SSG Andrade's body to be returned to the United States, Angelica went to work, and she cried there too. Ultimately, she had to take leave from work.[62]

Angelica was at the airport with her husband, parents, and SSG Andrade's mother and grandmother when his body was returned. She recalled feeling disbelief when she saw the casket draped in the American flag.[63] The funeral that followed remains a "blur" to Angelica, except for when they sang "Hail Mary." Angelica also recalled standing by herself near the gravesite for a few minutes before tossing a red rose onto her brother's casket.[64]

Angelica thinks about her brother often – when she passes the cemetery, hears a song he performed during a karaoke night they attended together, while watching her children play sports, and on holidays like Veterans Day and Memorial Day.[65] She tends to his gravesite, sometimes

---

[59]     *See id.*, ¶ 11.

[60]     *Id.*, ¶ 13.

[61]     *Id.*, ¶ 14.

[62]     *See id.*, ¶ 15.

[63]     *See id.*, ¶ 16.

[64]     *See id.*, ¶¶ 17-18.

[65]     *See id.*, ¶¶ 19-20.

bringing her children with her.[66] When she turned 27, a year older than SSG Andrade was when he died, she lamented the "years in his future that he never had the chance to live."[67] She described how SSG Andrade "was more than a brother – he was a really good friend who I could turn to," and she misses his advice and support.[68] She named her son "Robert" and feels that her brother's name lives on in that way.[69]

I believe that Plaintiffs have shown Angelica Andrade satisfies the "functional equivalent" test required for half-siblings to recover solatium damages and recommend an award of $2.5 million for her solatium claim.

### iv. Veronica D. Andrade[70]

SSG Andrade was five years old when his half-sister Veronica D. Andrade was born.[71] Like Angelica, Veronica also recalled vacations with her "family of five" to visit the Sequoia National Park and cousins in El Paso.[72] Also like Angelica, Veronica recalled watching SSG Andrade play soccer throughout his teen years.[73]

---

[66]    *See id.*, ¶ 19.

[67]    *Id.*, ¶ 23.

[68]    *Id.*, ¶ 22.

[69]    *See id.*, ¶ 24.

[70]    Veronica D. Andrade's declaration and birth certificate confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. J, birth certificate; Ex. K, Declaration of Veronica Denisse Andrade, dated November 4, 2020, ¶ 1.

[71]    *See id.*, ¶ 5.

[72]    *Id.*, ¶¶ 7, 8.

[73]    *See id.*, ¶ 9.

Veronica remembered praying for her brother during his three tours of Iraq.[74] She lived at home during his deployments, and felt fortunate that she was always able to talk on the phone with him when he called.[75] He would tell her how he liked playing with the Iraqi children, and she would update him on what was going on in her life.[76] She was "always so happy" to hear his voice, but it was even more "wonderful" when he returned home and lived at her parents' house.[77] SSG Andrade needed civilian clothes while he was home, and asked her to go shopping together. Veronica was flattered that he liked her style.[78] Before his last deployment, SSG Andrade used to drive Veronica to and from school each day.[79] The last time she saw him was the day he dropped her off at school.[80]

Veronica "clearly remember[s]" the military coming to her house to tell them that SSG Andrade had been killed.[81] They waited for her father to come home to deliver the news, as her mother was not SSG Andrade's biological mother, and when he arrived, her parents sent her to her room. After they left, her father told her what happened, although she already knew.[82]

Veronica described crying and having trouble sleeping while they waited for his body to be returned stateside.[83] She wanted him home but was also anxious about it becoming real. Indeed,

---

[74] *See id.*, ¶ 10.

[75] *See id.*, ¶ 13.

[76] *See id.*

[77] *Id.*, ¶¶ 11, 13.

[78] *See id.*, ¶ 12.

[79] *See id.*, ¶ 14.

[80] *See id.*

[81] *Id.*, ¶ 16.

[82] *See id.*, ¶ 17.

[83] *See id.*, ¶ 18.

17

when she saw his casket, she "cried and cried and was forced to accept that he was gone. It was really true."[84] Veronica does not remember much from the funeral or services except that she cried: "It's like part of my mind has decided it wants to erase those memories."[85]

████████████████████████████████████████████████████

███████████████████████████ She knows that when her brother comes to mind, or on certain dates like his birthday or the anniversary of his death, she will become very depressed or anxious "in ways that are probably more intense and painful than for other people."[86] Having lost him in such a tragic way "makes losing him that much harder for me to deal with."[87] Still, she cannot avoid thinking about him. SSG Andrade loved the holidays, and Veronica misses him especially during those times. She does not feel like she actually celebrates holidays anymore; she simply focuses on her children when her family gets together for holidays.[88]

Veronica described how she looked up to her brother, and misses being able to ask him for his advice. She decided to become a nurse partly because of how he helped people.[89] She wonders if he would have had children, because he would have been a good father.[90] She continues to talk

---

[84]    *Id.*, ¶ 19.

[85]    *Id.*, ¶¶ 21, 22.

[86]    *Id.*, ¶ 26.

[87]    *Id.*, ¶ 31.

[88]    *See id.*, ¶ 25.

[89]    *See id.*, ¶ 28.

[90]    *See id.*, ¶ 30.

to him and tell him about what she has going on in her life.[91] When she places fresh flowers at his grave, she asks if he likes them.[92]

I believe that Plaintiffs have shown that Veronica D. Andrade has satisfied the "functional equivalent" test required for half-siblings to recover solatium damages and recommend an award of $2.5 million for her solatium claim.

### b.    December 1, 2007, Attack – Baghdad

On December 1, 2007, Specialist ("SPC") Matthew K. Reece was conducting a patrol in the Rusafa neighborhood of Baghdad with a six-vehicle convoy when an explosive struck the right side of his vehicle. SPC Reece's casualty report confirms that he was killed in the attack. *See* 2022 WL 4764905, at *23. This Court found satisfactory evidence in the record to demonstrate that the explosive used in this attack was "an EFP traceable to Iran and its proxies," and found Iran responsible for the attack "by supporting proxy forces who conducted the attack." *Id.*

The Plaintiffs in this case injured as a result of this attack are Preston Reece, SPC Reece's brother; and Shaylyn C. Reece, SPC Reece's sister. *See* AC, ¶¶ 937-943. The following chart reflects the claim asserted by Plaintiffs injured in the December 1, 2007, attack, as well as the evidence setting forth the bases of that claim. That evidence is provided as exhibits to the accompanying Gielchinsky Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Preston Reece | SPC Reece's brother | Solatium claim $2.5 million | Copy of Preston Reece's birth certificate | L |
| | | | Declaration of Preston Reece, dated May 4, 2023 | M |

---

[91]    *See id.*, ¶ 31.

[92]    *See id.*, ¶ 24.

| Shaylyn Reece | SPC Reece's sister | Solatium claim $2.5 million | Copy of Shaylyn Reece's birth certificate | N |
| | | | Declaration of Shaylyn Reece, dated August 25, 2020 | O |

### 1.    Solatium Claims Brought by SPC Reece's Family Members

#### i.    Preston Reece[93]

Preston Reece called SPC Reece by his middle name, "Kyle."[94] He described how he and his three siblings grew up poor, living in a one-bedroom shack in the country. His parents fought often and divorced when Preston was fourteen and SPC Reece was nine.[95] Their father remarried a woman with whom Preston and SPC Reece did not get along: "it was a difficult situation."[96] Out of his three siblings, Preston felt closest to SPC Reece, and they supported each other.[97] They played GI Joe and video games, dug for nightcrawlers which they collected in empty cans, and went fishing.[98]

Preston described how SPC Reece "struggled to find direction" in his later years of high school. His girlfriend got pregnant and they decided to marry. The only two guests were Preston and his wife; Preston was the best man.[99] SPC Reece enlisted soon after, hoping for a career path

---

[93]    Preston Reece's declaration and birth certificate confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. L, birth certificate; Ex. M, Declaration of Preston Reece, dated May 4, 2023, ¶ 1.

[94]    *See id.*

[95]    *See id.*, ¶ 5.

[96]    *Id.*, ¶ 6.

[97]    *See id.*, ¶¶ 6-7.

[98]    *See id.*, ¶ 7.

[99]    *See, id.*, ¶ 8.

that would support his family.[100] Preston recalled how SPC Reece found basic training challenging and considered leaving. Preston encouraged him to stay, and SPC Reece completed the training successfully.[101]

SPC Reece was deployed to Iraq soon after his graduation, and again confided in Preston about the challenges he faced in the Army. This time, he gave Preston instructions for his burial in case he was killed, which rattled Preston.[102] Although worried himself, Preston had to reassure their mother that SPC Preston was safe. He coped with his own fears by avoiding news updates on what was happening in Iraq.[103]

SPC Reece's wife called Preston on December 1, 2007, with the news that SPC Reece had been killed.[104] While in shock, Preston called his parents to tell them, a task he characterized as "the hardest thing I would ever have to do."[105] He then visited each of them. All the while, he tried to remain focused so he could carry out SPC Reece's instructions for his burial.[106] He found it difficult to eat or sleep during this time, and at one point felt such intense physical pain he could not catch his breath and feared he was having a cardiac event.[107] ██████████████████████

██████████████████████

---

[100]    *See id.*, ¶ 9.

[101]    *See id.*, ¶ 10.

[102]    *Id.*, ¶¶ 12-13.

[103]    *See id.*, ¶ 15.

[104]    *See id.*, ¶ 16.

[105]    *Id.*, ¶ 17.

[106]    *See id.*, ¶ 18.

[107]    *See id.*, ¶¶ 18-19.

[108]    *See id.*, ¶ 20.

Preston received his brother's body at the Dover Air Force Base and accompanied him home. His funeral was held at his former high school where Preston delivered the eulogy.[109] Following his family's tradition of the men burying their relatives by hand, Preston was the first to place dirt on SPC Reece's coffin.[110]

Preston often returns to his brother's grave to talk to him.[111] Sometimes he tells him about what is going on his life, and sometimes he reminisces about the past.[112] Sometimes, he admits to SPC Reece that he feels guilty about encouraging him to remain at basic training: "Had I supported his impulse to leave the military, Kyle would still be alive."[113] Preston still has difficulty sleeping and often has violent nightmares. In one particular recurring dream that started after SPC Reece's death, Preston's son is dying and he cannot save him.[114] Preston knows that he "will miss Kyle every day for the rest of my life."[115]

I recommend an award of $2.5 million for Preston Reece's solatium claim.

>    ii. **Shaylyn Reece**[116]

Shaylyn was two years younger than SPC Reece,[117] and considered him the "greatest older

---

[109]    *See id.*, ¶ 21.

[110]    *See id.*, ¶ 22.

[111]    *See id.*, ¶ 25.

[112]    *See id.*

[113]    *Id.*

[114]    *See id.*, ¶ 24.

[115]    *See id.*, ¶ 26.

[116]    Shaylyn Reece's declaration and birth certificate confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. N, birth certificate; Ex. O, Declaration of Shaylyn Reece, dated August 25, 2020, ¶ 1.

[117]    *See* Ex. N, birth certificate.

brother."[118] Like Preston, Shaylyn also recalled fishing and digging up nightcrawlers with SPC Reece.[119] Shaylyn described what a talented basketball player SPC Reece was, and how she started playing because of him. He taught her how to become a better player, and the two would spend hours shooting hoops or playing with friends. They each made the school teams and went to each other's games.[120] Shaylyn recalled that SPC Reece let her hang out with his friends, but drew the line at dating them.[121]

Preston was the person who called Shaylyn to tell her that SPC Reece had been killed. Shaylyn told him his joke was a bad one, but he was serious and insisted that she come home.[122] She called her mother, but her aunt answered the phone. Shaylyn recalled that all she could hear "was my mother screaming."[123] According to Shaylyn, "[m]y mother was destroyed."[124]

Shaylyn called the sight of her brother being taken off the plane in a casket "sheer agony," and described how "[t]hat was the moment when reality set in."[125] She could barely stand and was overcome with sadness and loss.[126]

---

[118]     Ex. O, Declaration of Shaylyn Reece, dated August 25, 2020, ¶ 5.

[119]     *See id.*, ¶ 6.

[120]     *See id.*, ¶¶ 8-10.

[121]     *See id.*, ¶ 11.

[122]     *See id.*, ¶¶ 15-16.

[123]     *Id.*, ¶ 22.

[124]     *Id.*, ¶ 23.

[125]     *Id.*, ¶ 27.

[126]     *See id.*, ¶ 28.

Shaylyn has the same dream about SPC Reece every night – "He is there but I cannot get to him or talk to him."[127] She feels "riddled with guilt" at not being there to help her brother, at any moment during which "a hint of joy creeps into my life," at having children, and at being alive.[128] She explained that she has become "extremely overprotective" of her children, since she is afraid that "at any given moment something could happen and take my children from me, just like Kyle was taken from us."[129]

I recommend an award of $2.5 million for Shaylyn Reece's solatium claim.

### c.    March 20, 2007, Attack – Baghdad

On March 20, 2007, SPC Curtis Glawson, Jr. was situated as the commander of a 10-ton 984/A1 up-armored Heavy Expanded Mobility Tactical Truck ("HEMTT") when a multi-array explosive struck the vehicle's right side, destroying it and killing SPC Glawson. SPC Glawson's casualty report confirms that he was killed in the attack. *See* 2022 WL 4764905, at *17. The Court found satisfactory evidence in the record to demonstrate that the explosive responsible for SPC Glawson's death was an "EFP traceable to Iran and its proxies," and found Iran responsible for the March 20, 2007, EFP attack "by supporting proxy forces who conducted this attack. *Id.*, at *18.

The Plaintiffs in this case injured as a result of this attack are the SPC Glawson's estate; and Jazmon Reyna, SPC Glawson's half-sister. *See* AC, ¶¶ 641-48. The following chart reflects the claims asserted by each of the Plaintiffs injured in the March 20, 2007, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Gielchinsky Declaration.

---

[127]    *Id.*, ¶ 30.

[128]    *Id.*, ¶¶ 31-32.

[129]    *Id.*, ¶ 35.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Estate of Curtis E. Glawson, Jr. | Plaintiff decedent's estate | Economic loss claim $2,652,663.67 | Copy of Order Granting Letters of Administration | P |
| | | | Declaration of Hyunjung Glawson, dated April 2, 2021 | Q |
| | | | Appraisal of Present Value of Economic Life on Curtis Eric Glawson, Jr., dated May 29, 2023, prepared by L. Wayne Plumly, Jr., Ph.D. | R |
| Jazmon Reyna | SPC Glawson's half-sister | Solatium claim $3.125 million | Copy of Jazmon Reyna's birth certificate | S |
| | | | Declaration of Jazmon Reyna, dated May 5, 2023 | T |
| | | | Declaration of Yolanda Brooks, dated July 9, 2012, in *Karcher, et al. v. Islamic v. Republic of Iran*, No. 16-cv-00232 (CKK) | U |
| | | | Declaration of Sabrina Glawson on Behalf of the Estate of Cortez Glawson, dated July 2, 2019, in *Karcher, et al. v. Islamic v. Republic of Iran*, No. 16-cv-00232 (CKK) | V |

### 1.    Claim by Estate of Curtis E. Glawson, Jr.

#### i.    Economic Loss Claim

As the representative of SPC Glawson's estate,[130] Hyunjung Glawson[131] seeks

compensation for economic losses in the form of lost wages, benefits, and retirement pay.

---

[130]     *See* Ex. P, Order Granting Letters of Administration, dated November 14, 2017, appointing Hyunjung Glawson as representative of SPC Glawson's estate.

[131]     Hyunjung Glawson brought claims individually as a plaintiff in *Karcher, et al. v. Islamic Republic of Iran*, No. 16-cv-232 (CKK).

To project SPC Glawson's future income stream if not for the attack, Dr. Plumly incorporated testimonial evidence that he planned to serve 20 years in the Army, after which he would have opened a car repair shop in Alabama, and overlaid that information against statistical data generated by the Bureau of Labor Statistics, the Department of Labor, military pay websites, and other relevant sources.[132] From these sources, Dr. Plumly calculated the present value of SPC Glawson's lost income, assuming that SPC Glawson, who was 24 years old when he was killed, (1) would have remained in the military for 20 years; (2) would have opened a car repair shop in Alabama with an annual income of $65,070, adjusted annually by 3.085%, the percent change for the relevant years according to the U.S. Bureau of Labor Statistics; (3) would have started collecting Social Security Retirement ("SSR") benefits at age 67; and (4) had a life expectancy of 70.68 years.[133] Dr. Plumly adjusted these income figures for taxes and consumption, adjusted the SSR benefits for inflation, and adjusted the total lost earnings and SSR benefits to present value at a rate of 3.35%, the average yield of 30-year Treasury Bonds between 2006-2022.[134] Adjusted to present value, Dr. Plumly calculated the estate of SPC Glawson's economic loss claim as $2,652,663.67.[135] I recommend an award in this amount for the estate of SPC Glawson's economic loss claim.

---

[132]     *See* Ex. R, Appraisal of Present Value of Economic Life on Curtis Eric Glawson, Jr., dated May 29, 2023, prepared by L. Wayne Plumly, Jr., Ph.D., at 3-4.

[133]     *See id.*

[134]     *See id.* at 4-5.

[135]     *See id.* at 5.

1.    **Solatium Claims Brought by SPC Glawson's Family Members**

i.    **Jazmon Reyna**[136]

SPC Glawson was 15 years old when Jazmon Reyna was born to his mother, who had divorced his father the year before.[137] Jazmon was raised in the same house as SPC Glawson, their brother Cortez, and sister Kierra.[138] She was three years old when SPC Glawson enlisted in the military, which came as no surprise to her military family. SPC Glawson's parents had both served, and after SPC Glawson enlisted Cortez joined too.[139] Jazmon has served in the Air Force for the past eight years.[140]

The time difference prevented Jazmon from speaking to SPC Glawson when he called from his deployments; even though she asked her mother to wake her, her mother did not want her to be tired at school the next day.[141] Jazmon recalled how her brother sent her handmade gifts from whatever country he was stationed in, some of which she still has.[142] When SPC Glawson was stateside, Jazmon would watch for the little red car he drove, and when she spotted it, she would run to greet him. She "missed him constantly, and wanted to go everywhere he went when he was home."[143] SPC Glawson was accommodating, and let her tag along with him and his friends.[144] He

---

[136]    Jazmon Reyna's birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. S, birth certificate; Ex. T, Declaration of Reyna Jazmon, dated May 5, 2023, ¶ 1.

[137]    *See id.*, ¶ 4.

[138]    *See id.*

[139]    *See id.*, ¶ 5.

[140]    *See id.*, ¶ 24.

[141]    *See id.*, ¶ 6.

[142]    *See id.*, ¶ 7.

[143]    *Id.*, ¶ 8.

[144]    *See id.*, ¶¶ 8-9.

promised her that when she got older, the two of them would go on a trip somewhere together.[145] Jazmon's mother, a plaintiff in *Karcher, et al. v. Islamic v. Republic of Iran*, No. 16-cv-00232 (CKK), also remembered this promise, and described how "Curtis used to call her 'poo.' He'd call her from Iraq and tell her: 'When I get home, it's gonna be me and you, poo. This is what we are going to do.' And then he'd tell her where they were going to go together, Curtis and poo."[146]

Jazmon was nine when SPC Glawson was killed.[147] She and her mother were watching television together when two military officers rang the doorbell and told her mother about the attack. Jazmon remembered feeling "confused and terrified" when her mother "began to sob and fell to the floor,"[148] after which her mother "became hysterical and ran through the house grabbing pictures from the wall."[149] Jazmon remembered that "[i]n a state of panic and pain I ran from her to the corner of the room and cried myself to sleep."[150]

Jazmon recalled how her brother's head "was entirely wrapped in bandages" at the funeral, and when she asked why, she was told that he suffered extensive injuries to his head and that she was not allowed to touch or hug him.[151] According to Jazmon, SPC Glawson was "unrecognizable," and the "sight of him was jarring and haunts me to this day."[152]

---

[145]     *See id.*, ¶ 9.

[146]     Ex. U, Declaration of Yolanda Brooks, dated July 9, 2012, in *Karcher, et al. v. Islamic v. Republic of Iran*, No. 16-cv-00232 (CKK), ¶ 13.

[147]     *See* Ex. T, Declaration of Reyna Jazmon, dated May 5, 2023, ¶ 11.

[148]     *Id.*

[149]     *Id.*, ¶ 12.

[150]     *Id.*

[151]     *Id.*, ¶ 14.

[152]     *Id.*

Jazmon's family changed after SPC Glawson's death. She described how her mother became emotionally withdrawn, and she was "left to fend for myself for over a year."[153] Just nine years old, she prepared her own meals and ironed her own clothes while her mother sat in front of the television, "seemingly disconnected from everything around her, until she dozed off."[154] Her mother recalled this time as well: "I shut down for a year. I stopped cooking. I don't know what Kierra and Jazmon ate."[155] Jazmon managed to get her attention when she asked her to share stories about SPC Glawson. Sometimes, her mother would play videos she had recorded of SPC Glawson playing basketball, and the two would watch them for hours.[156]

Jazmon's brother, Cortez, also changed. She recalled overhearing her mother discussing him getting into some kind of trouble with the Army after SPC Glawson's funeral.[157] He was discharged and returned home, where "he started hanging out with the wrong crowd, engaging in drug and alcohol use."[158] Her family worried about him, aware that he was battling drug addiction.[159] Cortez's widow, Sabrina Glawson, represents his estate in *Karcher*, and further described the effect SPC Glawson's death had on him: "Cortez took Curtis's death very hard. From that moment of his finding out, everything went downhill as far as his drive and how he handled

---

[153]     *Id.*, ¶ 17.

[154]     *Id.*

[155]     Ex. U, Declaration of Yolanda Brooks, dated July 9, 2012, in *Karcher, et al. v. Islamic v. Republic of Iran*, No. 16-cv-00232 (CKK), ¶ 20.

[156]     *See* Ex. T, Declaration of Reyna Jazmon, dated May 5, 2023, ¶ 18.

[157]     *See id.*, ¶ 19.

[158]     *Id.*

[159]     *See id.,* ¶¶ 19-20.

his business. He never got counseling; he just felt like he could work it out himself."[160] He started "drinking excessively," and she would find him passed out under a table or in his car.[161] Sabrina explained that "[l]osing Curtis was like losing a piece of himself," and he was depressed.[162] He lost his drive to serve in the Army, and she and his mother sat down with his leadership to explain what he was going through. Cortez was honorably discharged, but his record reflected a failure to adapt. According to Sabrina, Cortez declined further after he left the Army: "He couldn't hold a job and was drinking heavily. He just let the drinking overcome him."[163]

Years later, in 2018, Jazmon and Cortez spoke on the phone about his new job and her new promotion. Jazmon recalled him sounding optimistic.[164] Later that day, her aunt called to tell her that Cortez was unresponsive and could not be resuscitated. He died of a fentanyl overdose, and Jazmon was tasked with delivering the news to her mother.[165]

SPC Glawson's other family members – his parents, Cortez's estate, and sister Kierra – are plaintiffs in *Karcher*, in which a motion for the appointment of special masters is pending. Once granted, they will each request upward departures of 25% to reflect their dual losses. Plaintiffs here similarly point to *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, at 86, in which the court made two awards to a family member whose brother and husband were both killed in the same attack and increased her award as a sibling by 25% because she turned to alcohol and drugs

---

[160]     Ex. V, Declaration of Sabrina Glawson on Behalf of the Estate of Cortez Glawson, dated July 2, 2012, in *Karcher, et al. v. Islamic v. Republic of Iran*, No. 16-cv-00232 (CKK), ¶ 9.

[161]     *Id.*

[162]     *Id.*

[163]     *Id.*, ¶ 10.

[164]     *See* Ex. T, Declaration of Reyna Jazmon, dated May 5, 2023, ¶ 20.

[165]     *See id.*

in an attempt to dull her pain. (The court did not grant an upward departure of her award in respect of her husband because she had only been married for six months before the attack.) While Cortez Glawson's extreme reaction to his brother's death is foreseeable and compensable in the form of an upward departure, Plaintiffs are not requesting *two* awards to compensate Jazmon for the loss of both brothers. Rather, their request for $3.125 million, representing a 25% upward departure from baseline FSIA awards for siblings, reflects the degree to which Cortez's suffering and death compounded the already profound tragedy of SPC Glawson's death. I recommend an award of $3.125 million for Jazmon Reyna's solatium claim.

### d.    May 5, 2006, Attack – Baghdad

On May 5, 2006, First Sergeant ("1SG") Carlos Saenz was traveling in the lead vehicle of a four-vehicle convoy returning from their mission when their vehicle was struck by a multi-array explosive, causing their vehicle to career into an oncoming dump truck. 1SG Saenz's casualty report confirms that he died as a result of the attack. *See* 2022 WL 4764905, at *12.[166] The Court found satisfactory evidence in the record to demonstrate that the explosive responsible for the May 5, 2006, attack was an "EFP traceable to Iran and its proxies," and found Iran responsible for the EFP attack "by supporting proxy forces who conducted this attack." *Id.* at *13.

The Plaintiffs in this case injured as a result of this attack are Joaquina Saenz Chorens, 1SG Saenz's mother; Luz Maria Estrada, 1SG Saenz's sister; and Frances Catherine Castro and Elva Espinoza, 1SG Saenz's half-sisters. *See* AC, ¶¶ 363-71. Because Joaquina Saenz Chorens is a permanent resident of the U.S., and not a naturalized citizen, Plaintiffs have indicated to me that they will wait to submit damages evidence for her claims until this Court issues a ruling on the plaintiffs' motion for renewed default judgment in *Roberts, et al. v. Islamic Republic of Iran*, No.

---

[166]    SGT Nathan Vacho was also killed in this attack; his estate is a plaintiff in *Karcher*.

20-cv-1227 (RCL), ECF No. 35-1. The following chart reflects the claims asserted by the other

Plaintiffs injured in the May 5, 2006, attack, as well as the evidence setting forth the bases of those

claims. That evidence is provided as exhibits to the accompanying Gielchinsky Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Luz Maria Estrada | 1SG Saenz's sister | Solatium claim $2.5 million | Copy of Luz Maria Estrada's certificate of naturalization | W |
| | | | Declaration of Luz Estrada-Pulido, dated June 1, 2023 | X |
| Elva Espinoza | 1SG Saenz's half-sister | Solatium claim $2.5 million | Copy of Elva Espinoza's certificate of citizenship | Y |
| | | | Declaration of Elva Espinoza, dated June 1, 2023 | Z |
| Frances Catherine Castro | 1SG Saenz's half-sister | Solatium claim $2.5 million | Copy of Frances Catherine Castro's U.S. passport | AA |
| | | | Declaration of Frances Castro, dated May 31, 2023 | BB |

### 1.    Solatium Claims Brought by 1SG Saenz's Family Members

#### i.    Luz Maria Estrada[167]

Luz Maria Estrada was one year younger than 1SG Saenz, and described how their father

left their mother while she was pregnant with her.[168] Their mother remarried and gave birth to their

half-sister Elva, and their family moved to the United States in 1970, after which her mother had

Frances and Daniel.[169] Luz said 1SG Saenz's stepfather favored his own children, and often

---

[167]    Luz Maria Estrada's certificate of naturalization and declaration confirm that she is a U.S. citizen. She is therefore eligible to bring claims under 28 U.S.C. § 1605A(a)(2)(A)(ii)(I). *See* Ex. W, certificate of naturalization; Ex. X, Declaration of Luz Estrada-Pulido, dated June 1, 2023, ¶ 1.

[168]    *See id.*, ¶¶ 5-6.

[169]    *See id.*, ¶ 6.

physically abused Luz, her mother, and 1SG Saenz.[170] 1SG Saenz protected Luz from his blows,[171] and protected her in other ways as well. He walked her to and from school and stood up to bullies for her.[172] According to Luz, 1SG assumed a patriarchal role in their family, and she looked up to him.[173] When 1SG Saenz joined junior ROTC in high school, Luz did too.[174] When he was scheduled to graduate high school as a senior, Luz earned enough credits to graduate as a junior so they could walk across the stage together.[175]

Luz was proud of 1SG Saenz's decision to join the Army, although concerned at the same time.[176] He continued to protect her by sparing her any knowledge of the hardships he encountered during his service, and she was "overjoyed" when he fulfilled his service commitment and returned home.[177] Luz described how she was "shocked" when her brother told her he had decided to re-enlist: "I could not fathom why he would risk his safety again."[178] 1SG Saenz returned from his first deployment to the Middle East safely, and deployed again in 2005 to Iraq.[179] Luz recalled "plead[ing] with him to stay," and 1SG Saenz responding that he would rather serve than see either of their sons fight in the war.[180]

---

[170]    *See id.*, ¶ 7.

[171]    *See id.*, ¶ 8.

[172]    *See id.*, ¶ 11.

[173]    *See id.*, ¶¶ 11-12.

[174]    *See id.*, ¶ 12.

[175]    *See id.*, ¶ 13.

[176]    *See id.*, ¶¶ 14-15.

[177]    *See id.*, ¶¶ 16-17.

[178]    *Id.*, ¶ 19.

[179]    *See id.*, ¶¶ 19, 22.

[180]    *See id.*, ¶ 22.

Luz and her family eagerly anticipated his return, which was scheduled to coincide with Mother's Day.[181] They had plans to watch sci-fi movies, which they both loved.[182] With just days until 1SG Saenz's return home, Luz received a phone call from her cousin telling her go to her mother's house. Luz recalled how, "[n]aturally, I became worried that something had happened to my mother."[183] Upon her arrival, Luz saw two military officers, and knew immediately what had happened.[184]

Luz described feeling angry at her brother for re-enlisting, and angry at his wife for encouraging him.[185] She struggled to eat, sleep, and get dressed, and took time off of work.[186] She avoided people, not wanting to hear their condolences.[187] The only thing that kept her going was the fact that her family needed her to be strong.[188] Luz eventually returned to work; as a single mother, she had to earn a living for her children.[189] She described herself as feeling "overwhelming grief and sorrow" ████████████████████████████████████████████████
████████████████████████████████[190]

---

[181]    *See id.*, ¶ 25.

[182]    *See id.*

[183]    *See id.*

[184]    *See id.*, ¶ 26.

[185]    *See id.*, ¶¶ 19, 28.

[186]    *See id.*, ¶ 29.

[187]    *See id.*

[188]    *See id.*, ¶ 27.

[189]    *See id.*, ¶ 30.

[190]    *See id.*, ¶ 31.

1SG Saenz's death "fractured" their family, according to Luz. They no longer gather for holidays, birthdays, or family dinners, finding it easier to cope with his passing by themselves.[191] Luz's family's relationship with 1SG Saenz's wife also grew increasingly strained, and they have not been able to spend time with 1SG Saenz's son as a result.[192] Luz grieves not being able to tell her nephew about his father, and the missed opportunity for him to grow up with his cousins.[193] She misses the "one person who had the innate ability to comfort me when I was feeling depressed or anxious."[194] She describes her sadness as being "so deep that it never truly fades, regardless of how much time goes by."[195]

I recommend an award of $2.5 million for Luz Maria Estrada's solatium claim.

### ii.    Elva Espinoza[196]

1SG Saenz was seven years old when Elva Espinoza was born to his mother and stepfather.[197] Elva recalled her father attacking her along with her older siblings, and 1SG Saenz

---

[191]    *See id.*, ¶ 34.

[192]    *See id.*, ¶ 35.

[193]    *See id.*

[194]    *Id.*, ¶ 32.

[195]    *Id.*, ¶ 36.

[196]    Elva Espinoza's certificate of citizenship and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. Y, certificate of citizenship; Ex. Z, Declaration of Elva Espinoza, dated June 1, 2023, ¶ 1.

[197]    *See id.*, ¶¶ 2-3, 5.

protecting her.[198] According to Elva, "he was the only paternal figure I had in my life."[199] He gave her money when she needed it and taught her how to drive and take care of her car.[200]

Elva recalled sobbing with her sister and mother when they brought 1SG Saenz to the bus that would take him to boot camp.[201] She was "terrified that something awful might happen to him."[202] She sent him care packages while he was away and the two exchanged letters regularly. Like Luz, Elva was relieved when his service commitment ended and concerned at his decision to subsequently re-enlist.[203] Once again she was "terrified" that something would happen to 1SG Saenz while he was deployed to Iraq, and she "begged" him not to go.[204] Elva prayed every single day for his safe return.[205]

Elva's sister called her on May 5, 2006, telling her to go to their mother's house. Like Luz, Elva assumed that something had happened to their mother and rushed over, only to find two military officers.[206] She recalled her mother "consumed with anger, shouting at the officers, and accusing them of being responsible for her son's death."[207] Overwhelmed, Elva cried herself to

---

[198]     *See id.*, ¶ 6.

[199]     *Id.*, ¶ 6.

[200]     *See id.*, ¶¶ 7-8.

[201]     *See id.*, ¶ 11.

[202]     *Id.*

[203]     *See id.*, ¶¶ 12-15.

[204]     *Id.*, ¶ 18.

[205]     *See id.*, ¶ 19.

[206]     *See id.*, ¶ 20.

[207]     *Id.*, ¶ 21.

sleep and awoke with her mind racing. She was scared to leave her mother's side, fearing that "she might try to join Carlos."[208]

Elva bought clothes for her children to wear to their first funeral, "furious" that everyone else in the store was carrying on with their lives while her world had come to a halt.[209] She and her family met 1SG Saenz's body at the airport and buried him, after which she could not eat, sleep, or stop crying.[210] She "fell into a deep depression," punctuated by "panic attacks that left me paralyzed" when she encountered anything that reminded her of her brother.[211] ███████ ███████████████████████████████████[212] Working and staying busy helped, and Elva credits her faith with getting her though that terrible time.[213]

Like Luz, Elva described how her family does not continue their tradition of getting together to celebrate holidays, explaining that her mother was not willing to celebrate without 1SG Saenz.[214] She has not heard from her sister-in-law or nephew in years, and it brings her "great sadness" to know that she and her brother will never fulfill their plan to bring their children to Mexico, their birthplace.[215] She explains that her family "not only lost Carlos; we lost each other as well."[216]

---

[208] *Id.*, ¶ 22.

[209] *Id.*

[210] *See id.*, ¶¶ 23-24.

[211] *Id.*, ¶ 24.

[212] *See id.*

[213] *See id.*, ¶¶ 24-25.

[214] *See id.*, ¶ 27.

[215] *Id.*, ¶ 26.

[216] *Id.*, ¶ 29.

I believe that Plaintiffs have shown that Elva Espinoza has satisfied the "functional equivalent" test required for half-siblings to recover solatium damages, and recommend an award of $2.5 million for her solatium claim.

### iii.    Frances Castro[217]

Frances Castro was born in the U.S., after her family moved there from Mexico.[218] Unlike her sisters, she was close with her father, and was devastated at his death when she was seven years old. Her mother had to work long hours to support them, and "Carlos stepped in to fill the void."[219] 1SG Saenz acted as Frances's "parent," playing boardgames and even house with her, walking her to school, preparing her dinner, and getting her ready for bed.[220] 1SG Saenz even spoke to Frances's teachers to make sure she was receiving the support in school she needed.[221] Whether Frances needed protection from bullies or help about boys, she turned to 1SG Saenz.[222] Frances called her brother a "solid presence" in her life, "a dependable older brother who never let me down."[223] When he was away for Army training, 1SG Saenz would write her letters with a drawing of an animal, and specifically ask to speak to her when he called home.[224]

---

[217]    Frances Castro's U.S. passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. AA, U.S. passport; Ex. BB, Declaration of Frances Castro, dated May 31, 2023, ¶ 1.

[218]    *See id.*, ¶ 3.

[219]    *Id.*, ¶ 4.

[220]    *Id.*, ¶ 5.

[221]    *See id.*, ¶ 6.

[222]    *See id.*

[223]    *See id.*

[224]    *See id.*, ¶ 10.

Frances lived with 1SG Saenz and his girlfriend during the interim between his service periods. She described how she had a "rough patch" in her life, but with his support was able to secure a steady job that he drove her to and from.[225] Frances returned to their house often after 1SG Saenz married his girlfriend and had a son: "I was ecstatic to become an aunt and took my role seriously."[226]

Frances recalled crying even before the military officers parked at her mother's house uttered a single word.[227] Her entire body ached, even her scalp.[228] She longed to see her brother's body, but his wife insisted that the casket remain closed because of his injuries.[229] She feels uncertain to this day about "whether it was truly Carlos who was laid to rest."[230]

After 1SG Saenz's funeral, Frances found it difficult to eat or sleep, and when she did sleep, she had nightmares of seeing people being killed. Occasionally, her brother would appear in her dream and then vanish, leaving her feeling like she had lost him all over again. Frances's anxiety grew with time, ███████████████████████████████████████ ████████████████████████ Frances acknowledges that her brother's death has left her "consumed" with worry over something bad happening to her children.[232] She is "constantly"

---

[225]    *Id.*, ¶ 12.

[226]    *Id.*, ¶ 14.

[227]    *See id.*, ¶ 17.

[228]    *See id.*, ¶ 19.

[229]    *See id.*, ¶ 20.

[230]    *Id.*

[231]    *Id.*, ¶ 21.

[232]    *Id.*, ¶ 22.

fearful for them and explains: "I do not think I would be able to survive the loss of another person I loved."[233]

I believe that Plaintiffs have shown that Frances Castro has satisfied the "functional equivalent" test required for half-siblings to recover solatium damages and recommend an award of $2.5 million for her solatium claim.

### e.    April 22, 2011, Attack – Numaniyah

On April 22, 2011, Private First Class ("PFC") Antonio Stiggins was occupying the gunner position in the second vehicle of a multi-vehicle convoy traveling west on Alternate Supply Route Bismark when his vehicle was struck by a multi-array explosive emplaced on the right side of the road at approximately 2:18 p.m. local time. PFC Stiggins's casualty report confirms that he was killed as a result of the blast. *See* 2022 WL 4764905, at *42. This Court found satisfactory evidence in the record to demonstrate that the explosive used in this attack was "an EFP traceable to Iran and its proxies," and found Iran responsible for the attack "by supporting proxy forces who conducted the attack." *Id.* at *43.

The Plaintiffs in this case injured as a result of this attack are the estate of Antonio Stiggins; Angel Mayes, PFC Stiggins's mother; Luke Stiggins, PFC Stiggins's father; and Donald Mayes, PFC Stiggins's stepfather. *See* AC, ¶¶ 1303-11. The following chart reflects the claims asserted by the Plaintiffs injured in the April 22, 2011, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Gielchinsky Declaration.

---

[233]    *Id.*

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Estate of Antonio Stiggins | Deceased victim | Economic loss claim $3,493,441.47 | Copy of Order for Formal Appointment of Personal Representative for the Purposes of Litigation under the Wrongful Death Act, dated May 3, 2016 | CC |
| | | | Declaration of Angel Mayes, dated March 23, 2023 | DD |
| | | | Appraisal of Present Value of Economic Life of Antonio Stiggins, dated April 27, 2023, prepared by L. Wayne Plumly, Jr., Ph.D. | EE |
| | | Conscious pain and suffering claim $1 million | Copy of AR 15-6 Investigation Report for April 22, 2011, attack | FF |
| Angel Mayes | PFC Stiggins's mother | Solatium claim $5 million | Copy of Angel Mayes's U.S. passport | GG |
| | | | Declaration of Angel Mayes, dated June 28, 2021 | HH |
| Luke Stiggins | PFC Stiggins's father | Solatium claim $5 million | Copy of Luke Stiggins's birth certificate | II |
| | | | Declaration of Luke Stiggins, dated June 13, 2023 | JJ |
| Donald Mayes | PFC Stiggins's stepfather | Solatium claim $3.75 million | Copy of Donald Mayes's U.S. passport | KK |
| | | | Declaration of Donald Mayes, dated June 18, 2021 | LL |

### 1. Claims Brought by PFC Stiggins's Estate

#### i. Economic loss claim

As the representative of PFC Stiggins's estate,[234] Angel Mayes seeks compensation for

---

[234]    *See* Ex. CC, Order for Formal Appointment of Personal Representative for the Purposes of Litigation under the Wrongful Death Act, dated May 3, 2016, appointing Angel Mayes as representative of PFC Stiggins's estate.

economic losses in the form of lost wages, benefits, and retirement pay. *See* 28 U.S.C. § 1605A(c) ("damages may include economic damages").

To project PFC Stiggins's future income stream if not for the attack, Dr. Plumly incorporated testimonial evidence that he planned to serve three years in the Army, after which he would have returned to college to become an electrical engineer and secured employment in that field in Albuquerque, New Mexico, and overlaid that information against statistical data generated by the Bureau of Labor Statistics, the Department of Labor, military pay websites, and other relevant sources.[235] From these sources, Dr. Plumly calculated the present value of PFC Stiggins's lost income, assuming that PFC Stiggins, who was 25 years old when he was killed, (1) would have remained in the military for three years; (2) would have used the GI Bill to become an electrical engineer and secured employment in New Mexico with an annual income of $93,080.00, adjusted annually by 3.085%, the percent change for the relevant years according to the U.S. Bureau of Labor Statistics; (3) would have started collecting SSR benefits at age 67; and (4) had a life expectancy of 76.71 years.[236] Dr. Plumly adjusted these income figures for taxes and consumption, adjusted the SSR benefits for inflation, and adjusted the total lost earnings and SSR benefits to present value at a rate of 3.35%, the average yield of 30-year Treasury Bonds between 2006-2022.[237] Adjusted to present value, Dr. Plumly calculated the estate of PFC Stiggins's economic loss claim as $3,493,441.47.[238] I recommend that the Court award this amount for the estate of PFC Stiggins's economic loss claim.

---

[235]    *See* Ex. EE, Appraisal of Present Value of Economic Life of Antonio Stiggins, dated April 27, 2023, prepared by L. Wayne Plumly, Jr., Ph.D., at 3-4.

[236]    *See id.*

[237]    *See id.* at 4-5.

[238]    *See id.* at 5.

## ii. Conscious pain and suffering claim

The Army's investigation into the April 22, 2011, attack reflects that two hours and fourteen minutes elapsed between the time of the attack and PFC Stiggins's death.[239] During that time, PFC Stiggins, who "suffered severe wounds to his pelvis,"[240] "was conscious and was able to hold" the hand of the soldier attending to him.[241] When medics "attempted to start an IV on PFC Stiggins, … he was becoming combative," so "personnel [had to] hold PFC Stiggins down so he could start an IV, which he finally accomplished."[242] PFC Stiggins then "pulled his arm away, pulling the catheter out."[243] Soldiers "again tried to start an IV, but PFC Stiggins began trying to sit up, making it impossible for the medic to start the IV."[244] PFC Stiggins was then loaded onto a medavac flight to the combat support hospital, where he was pronounced dead.[245] The AR 15-6 does not reflect whether PFC Stiggins was conscious during this ride, but it does make clear that PFC Stiggins was conscious after the attack occurred at 1418 until at least two minutes before the helicopter arrived,[246] which was 40 minutes later, at 1458.[247]

I recommend an award of $1 million for the estate of PFC Stiggins's conscious pain and suffering claim. *See Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217,

---

[239]    *See* Ex. FF, AR 15-6 Investigation Report for April 22, 2011, attack, at 34 of the pdf under "Facts."

[240]    *Id.* at 17 of the pdf.

[241]    *Id.* at 18 of the pdf.

[242]    *Id.*

[243]    *Id.*

[244]    *Id.*

[245]    *See id.* at 21-22 of the pdf.

[246]    *See id.* at 123 of the pdf.

[247]    *See id.* at 37 of the pdf.

234 (S.D.N.Y. 2003), *amended*, 2003 WL 23324214 (S.D.N.Y. May 19, 2003) (awarding plaintiff who *may* have experienced conscious pain and suffering $1 million); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 113 (D.D.C. 2000) (awarding plaintiff who struggled with his assassin for thirty seconds before being shot and killed $1 million).

### 2. Solatium Claims Brought by PFC Stiggins's Family Members

#### i. Angel Mayes[248]

Knowing that her son was conscious before his death "overwhelms" PFC Stiggins's mother, Angel Mayes.[249] Angel learned from the investigative report that the medics were delayed in their ability to treat her son, and wonders if faster treatment could have resulted in a different outcome.[250] PFC Stiggins was her only child, and according to Angel, "[l]osing an only child is different than any other loss. It is like I lost my own life with his."[251]

Angel got divorced from PFC Stiggins's father when PFC Stiggins was about nine years old. PFC Stiggins lived with Angel throughout the year, and with his father during the summers and alternate holidays.[252] The custody arrangement was "amicable,"[253] and when Angel remarried two years later, she described how they "simply enjoyed our time as a family of three, doing

---

[248]    Angel Mayes's U.S. passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. GG, U.S. passport; Ex. HH, Declaration of Angel Mayes, dated June 28, 2021, ¶ 1.

[249]    *Id.*, ¶ 49.

[250]    *See id.*

[251]    *Id.*, ¶ 50.

[252]    *See id.*, ¶ 7.

[253]    *Id.*

everyday things together."[254] She believes that her son's decision to join the military may have been influenced by her second husband's years of service in the Air Force.[255]

Angel recalled how boot camp changed her son at his graduation: "when I saw Antonio, I realized the boy was gone; my son had grown into a man."[256] At home after graduation and before his pre-deployment training, PFC Stiggins "proudly wore his uniform everywhere he went," taking care "to make sure his cavalry beret was in the perfect position."[257] He got a haircut every other day to "look as he should."[258] He also spent time with Angel's mother, who was suffering with cancer at the time.[259]

The prospect of PFC Stiggins's deployment was difficult on Angel, and she and her husband drove eight hours to his station to visit him before he left.[260] They kept in touch by telephone and mail while he was in Iraq, and when her mother died PFC Stiggins came home for the funeral.[261] At the airport before his flight back, Angel told her son that if something were to happen to him, she would "just die."[262]

The military officers visited PFC Stiggins's father's home first, who insisted that he

---

[254] *Id.*, ¶¶ 8-9.

¶

[255] *Id.*, ¶ 15.

[256] *Id.*, ¶ 17.

[257] *Id.*, ¶ 21.

[258] *Id.*

[259] *See id.*

[260] *See id.*, ¶ 22.

[261] *See id.*, ¶ 23.

[262] *Id.*, ¶ 24.

accompany them to her home.[263] Every part of their visit was "unbearable," according to Angel. She screamed, grabbed her ex-husband's chest, rocked back and forth, and shook. ███████

████████████

████████████████████████████████████

She developed "significant memory loss" after her son was killed, which impeded her work and interfered with her memories of her son.[266] Eventually, many of her memories returned, but some continue to elide her, which she finds very upsetting.[267] Angel has met with a grief counselor, but for the most part, shares her thoughts with God, her husband, and PFC Stiggins's father.[268] Angel and her husband, and PFC Stiggins's father and his wife, get together every year on the anniversary of PFC Stiggins's death to talk about him.[269] She visits her son's grave with his father sometimes, and sometimes with her husband.[270] Angel started celebrating Christmas again after refusing to do so for the first few years, but states that "[a]s a whole, the holidays are filled with sorrow."[271] She does not "feel connected to anything"; "every day is filled with my overwhelming loss."[272]

I recommend an award of $5 million for Angel Mayes's solatium claim.

---

[263]    *See id.*, ¶ 26.

[264]    *See id.*, ¶ 27.

[265]    *See id.*, ¶ 43.

[266]    *Id.*

[267]    *See id.*

[268]    *See id.*, ¶ 41.

[269]    *See id.*, ¶ 38.

[270]    *See id.*, ¶ 40.

[271]    *Id.*, ¶ 39.

[272]    *Id.*, ¶ 47.

### ii.  Luke Stiggins[273]

Luke Stiggins recalled the early days of his marriage to PFC Stiggins's mother, when the three of them would go on camping trips in Colorado.[274] His son loved the outdoors, and used to run until he was exhausted.[275] He continued taking his son camping after remarrying when PFC Stiggins was ten years old; his wife had a son the same age, and the two boys were always "into something."[276] Their relationship "thrilled" Luke,[277] who also recalled the boys getting their truck stuck in the mud as teenagers, and taking their clothes off to keep them clean.[278]

Luke attributes PFC Stiggins's decision to enlist in the Army to a conversation they had during which Luke told his son to consider the military as an option to pull himself out of a tough time in his life.[279] Luke recalled how "driven" his son was during training, although he never lost his sense of humor.[280] The two wrote to each other and spoke on the phone.[281] Luke also sent his son care packages while he was deployed with shaving cream, razors, and cookies. If Angel was sending a package to their son, he would include items in it.[282]

---

[273]     Luke Stiggins's birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. II, birth certificate; Ex. JJ, Declaration of Luke Stiggins, dated June 13, 2023, ¶ 1.

[274]     *See id.*, ¶ 8.

[275]     *See id.*

[276]     *Id.*, ¶¶ 10-11.

[277]     *Id.*, ¶ 10.

[278]     *See id.*, ¶ 12.

[279]     *See id.*, ¶ 17.

[280]     *See id.*, ¶¶ 18-19.

[281]     *See id.*, ¶¶ 20-21.

[282]     *See id.*, ¶ 22.

Luke recalled how he shifted into "some type of autopilot mode" when the military officers gave him their "speech" about his son being killed, which allowed him to have the presence of mind to escort them to Angel's house.[283] Still, he does not remember what happened at Angel's house, calling that time "a blur."[284] Luke does remember shaking when he met his son's body at the airport, and the reality of his son being "truly gone" hitting him at that moment.[285]

Crowds of people lined the local streets on the way to the mortuary, and Luke recalled feeling very proud of his son, especially when he saw the flag hung by the fire department.[286] When he saw his son in his casket, he told him about that pride, and that he loved and missed him.[287]

After his son's death, Luke started having dreams about "a Tony who is alive and well."[288] In some of these dreams, PFC Stiggins is the same age as when he was killed, and they are planning a fishing or hunting trip together. In others, he has a wife and children. Luke described how he awakens from these dreams "forced to deal with the reality that he is gone."[289] According to Luke, these dreams have had a more powerful effect on him as time has passed.[290]

Luke also developed other sleep issues after his son's death. He has difficulty sleeping and experiences "jerky sleep," during which his "arms start flailing, and my body suffers through

---

[283] *Id.*, ¶ 29.

[284] *Id.*

[285] *Id.*, ¶ 31.

[286] *See id.*, ¶ 34.

[287] *See id.*, ¶ 36.

[288] *Id.*, ¶ 42.

[289] *Id.*

[290] *See id.*

violent movements while I'm sleeping."[291] Those symptoms, along with Luke's increased anxiety and temper,[292] led him to seek counseling in 2011, as he had never experienced them before his son's death.[293] Luke was diagnosed with PTSD ███████████████, and continues his psychotherapy.[294] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Despite these interventions, Luke continues to have his dreams and "jerky sleep," and has learned from his psychologist that these and his other symptoms are effects of the PTSD ████████████████████ which are "connected to losing my only child."[296]

Luke used to weep at his son's gravesite. He used to bring beers there and leave one, but for the past three or four years, he has been too heartbroken to go.[297] He valued the tradition of meeting his ex-wife and her husband at a restaurant every year on the anniversary of the attack to share memories of PFC Stiggins, calling it a "memorial gathering of sorts," but that stopped with the pandemic.[298] Like Angel, holidays have lost their meaning for Luke, especially Good Friday, the day he found out his son died.[299]

I recommend an award of $5 million for Luke Stiggins's solatium claim.

---

[291] *Id.*, ¶ 43.

[292] *See id.*, ¶ 44.

[293] *See id.*, ¶ 45.

[294] *See id.*

[295] *See id.*, ¶ 46.

[296] *Id.*, ¶ 45.

[297] *See id.*, ¶ 39.

[298] *Id.*, ¶ 40.

[299] *See id.*, ¶ 47.

### iii. Donald Mayes[300]

Donald Mayes married PFC Stiggins's mother when PFC Stiggins was eleven years old, and dated her for two years prior to that.[301] He had two older sons from a previous marriage, and once he married Angel, "considered myself a father of three boys."[302] Donald described how PFC Stiggins lived with him and Angel during the year, during which their family of three "spent lots of time outdoors."[303] They were "a happy family," sharing dinner together every evening.[304] Donald cheered him on when he ran track, and gave him rides in the biplane he operated for work.[305]

Donald was proud of PFC Stiggins's decision to join the Army; he had served in the Air Force years earlier.[306] He recalled how "a light had turned on inside Tony" after basic training, and "he had begun to become the man he was meant to be."[307] PFC Stiggins was deployed to Iraq in September 2010, and Donald grew concerned, making sure to watch the news throughout his tour. When PFC Stiggins was granted leave to attend his grandmother's funeral during his deployment, Donald recalled thinking that would be the last time he saw him.[308]

---

[300]    Donald Mayes's U.S. passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. KK, U.S. passport; Ex. LL, Declaration of Donald Mayes, dated June 18, 2021, ¶ 1.

[301]    *See id.*, ¶¶ 5, 7.

[302]    *Id.*, ¶ 8.

[303]    *Id.*, ¶ 9.

[304]    *Id.*, ¶ 10.

[305]    *See id.*, ¶¶ 11-12.

[306]    *See id.*, ¶ 15.

[307]    *Id.*, ¶ 16.

[308]    *See id.*, ¶¶ 18-19.

If Donald thinks about the military officers' visit to their house to relay the news of PFC Stiggins's death, he will still tear up.[309] He recalled how his wife "was a wreck."[310] At the airport to recover PFC Stiggins's body, he had to hold her back from running to the casket.[311]

Donald's older son had died three years before PFC Stiggins, and he already knew that "[w]hen you sit and face a casket, knowing your kids is in it, you can do nothing but feel overwhelmed by a kind of agony."[312] Although he was suffering too, he did his best to comfort Angel.[313]

Donald described how he has "suffered personal losses, deep and painful losses in my life, like losing Tony."[314] He copes by trying to suppress his feelings and not focusing on the sadness; instead, he focuses on Angel and her suffering: "I feel my own pain, but I need to be strong enough to be there for her."[315] Still, he tears up at various times thinking about the "tremendous loss" of PFC Stiggins.[316]

As described above, the court in *Fritz* adopted the special master's recommendation to award the stepmother of one of the service members $1.5 million at the request of the plaintiffs in that case – 25% of the amount the court awarded to that service member's biological mother. *See* 2018 WL 5046229, *22. The special master opined that "[i]t would not be unreasonable to award

---

[309]    *See id.*, ¶ 20.

[310]    *Id.*, ¶ 21.

[311]    *See id.*, ¶ 22.

[312]    *Id.*, ¶¶ 20, 26.

[313]    *See id.*, ¶ 26.

[314]    *Id.*, ¶ 32.

[315]    *Id.*

[316]    *Id.*, ¶¶ 32, 35.

a higher amount to Vanessa" than the $1.5 million plaintiffs requested on her behalf, "but in light of Vanessa's testimony – which indicates that while she feels a loss, the focus of her concern is the effect that Bryan's death has had on her husband," the plaintiffs' request was reasonable and appropriate. *Id.*

Donald Mayes lived in the same household as PFC Stiggins since he was eleven years old, and considered him "my youngest son."[317] While Donald Mayes' testimony reflects that much of his suffering stems from the effects that PFC Stiggins's death has had on Angel, I believe that his own relationship with PFC Stiggins from a young age merits an award of $3.75 million for his solatium claim – i.e, 75% of the award requested for Angel.

## CONCLUSION

For the reasons stated above, I recommend the Court approve the following awards:

| Plaintiff | Relationship to Victim | Recommended Award |
|---|---|---|
| Estate of Roberto Andrade | Deceased victim | Economic loss $1,786,097.12 |
| Sandra Valencia | SSG Andrade's mother | Solatium $5 million |
| Veronica Pena Andrade | SSG Andrade's stepmother | Solatium $5 million |
| Angelica Andrade | SSG Andrade's half-sister | Solatium $2.5 million |
| Veronica D. Andrade | SSG Andrade's half-sister | Solatium $2.5 million |
| Preston Reece | SPC Reece's brother | Solatium $2.5 million |
| Shaylyn Reece | SPC Reece's sister | Solatium $2.5 million |
| Estate of Curtis E. Glawson, Jr. | Plaintiff decedent's estate | Economic loss $2,652,663.67 |
| Jazmon Reyna | SPC Glawson's half-sister | Solatium $3.125 million |
| Luz Maria Estrada | 1SG Saenz's sister | Solatium $2.5 million |

---

[317] *Id.*, ¶ 8.

| | | |
|---|---|---|
| Elva Espinoza | 1SG Saenz's half-sister | Solatium $2.5 million |
| Frances Catherine Castro | 1SG Saenz's half-sister | Solatium $2.5 million |
| Estate of Antonio Stiggins | Deceased victim | Economic loss $3,493,441.47 |
| Estate of Antonio Stiggins | Deceased victim | Pain and suffering claim $1 million |
| Angel Mayes | PFC Stiggins's mother | Solatium $5 million |
| Luke Stiggins | PFC Stiggins's father | Solatium $5 million |
| Donald Mayes | PFC Stiggins's step-father | Solatium $3.75 million |

Date:   June 22, 2023                    Respectfully submitted,



                                         /s/ Stephen A. Saltzburg
                                         Special Master